E-FILED
Friday, 04 September, 2009 02:53:26 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| Roger A. Forrest, Jr., | ) | |
|             Plaintiff | ) | |
| | ) | |
| v. | ) | Case No. 07-4086 |
| | ) | |
| Michael Prine and Michael Huff, | ) | |
|             Defendants | ) | |

**OPINION AND ORDER**

The parties have consented to have this case heard to judgment by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and the District Judge has referred the case to me.  Now before the Court are: Defendant Michael Prine's Motion for Summary Judgment (#64);  and Defendant Michael Huff's Motion for Summary Judgment (#66).  The motions are fully briefed, and I have carefully considered the arguments and evidence presented by the parties.  As explained below, both motions are granted.  In addition, Prine has filed a motion for oral argument (#65), which is denied as moot.

**SUMMARY JUDGMENT GENERALLY**

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment should be entered if and only if there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. See Jay v. Intermet Wagner Inc., 233 F.3d 1014, 1016 (7th Cir.2000);  Cox v. Acme Health Serv., 55 F.3d 1304, 1308 (7th Cir. 1995).

In ruling on a summary judgment motion, the court may not weigh the evidence or resolve issues of fact; disputed facts must be left for resolution at trial.  Anderson v. Liberty Lobby, Inc., 477

U.S. 242 (1986). The court's role in deciding the motion is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe. Waldridge v. American Hoechst Corp., 24 F.3d 918, 922 (7th Cir.1994). The court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial.

The court is to examine all admissible facts, viewing the entirety of the record and accepting all facts and drawing all reasonable inferences in favor of the non-movant, Erdman v. City of Ft. Atkinson, 84 F.3d 960, 961 (7th Cir. 1996), and construing any doubts against the moving party. Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970).

If the undisputed facts indicate that no reasonable jury could find for the party opposing the motion, then summary judgment must be granted. Hedberg v. Indiana Bell Tel. Co., 47 F.3d 928, 931 (7th Cir. 1995), citing Anderson, 477 U.S. at 248. If the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party and on which that party will bear the burden of proof at trial, then summary judgment is proper. Celotex, 477 U.S. at 322; Waldridge, 24 F.3d at 920.

## UNDISPUTED FACTS

The following facts are taken from the parties' statements of undisputed facts, the responses and replies thereto, and the evidence submitted in support.

On March 8, 2007, Rock Island police were dispatched to the home of Roger Forrest after receiving a 911 call from his minor son, who claimed Forrest was hitting people in their home. Roger Forrest at the time was 42 years old. He was just under 6' tall and weighed 280 pounds. When the police arrived, they found, Forrest vehemently uncooperative, and the officers were required to enter the home forcefully. Once inside, an altercation occurred, and Forrest struck one of the officers in

the face. Before the officers were successful in gaining control of Forrest, they had used tasers on Forrest 3 or 4 times.

Once Forrest was in the squad car, he was taken to the Rock Island County jail for booking. Somewhere between 3 and 7 police officers arrived at the jail with Forrest. They informed the correctional officers, including defendant Michael Prine, that Forrest was being charged with aggravated battery to a police officer and domestic violence, and that he had already been tased several times by the police officers. Forrest claims that he was cooperative at the jail until the underlying events began[1].

Forrest alleges in his complaint that he "is visibly disabled due to work injuries" and he testified that he walks with a cane. His cousin, CO. Roberts, has seen him using a cane in the past but there is no evidence that he was using a cane at the jail, nor is there any evidence that anyone at the jail saw him limp, observed that he had difficulty walking, or were told that he had a bad knee. In fact, Forrest himself testified that he was in his cell pacing back and forth. Regardless, this disability is not material to the issues in this motion, so who knew what about it is of no import.

At the Rock Island County jail, it is mandatory procedure that any person charged with a felony or a drug charge must submit to a complete strip search as part of the booking process, in order to ensure that no weapons or drugs are brought into the jail and that there is no threat to the safety of the arrestee or the correctional officers. The standard procedure requires the prisoner to remove all his clothing, stick out his tongue, lift his arms over his head, turn around, lift his testicles, bend over, spread his cheeks, squat down and cough, and lift up the bottoms of his feet.

---

[1]The officers at the jail do not agree whether Forrest was calm or still agitated and angry when he arrived at the jail, but for purposes of this motion, Forrest is entitled to inferences in his favor, so it is assumed that he was calm at that time.

Once inside the jail, Forrest was led to a holding cell, still handcuffed. In the holding cell with him were Correctional Officers Michael Mendoza and Patrick Roberts, both of whom believed that, based on his appearances, Forrest was under the influence of alcohol. The officers removed the handcuffs once Forrest was in the cell, and ordered him to undress. Forrest began taking off his clothes, but he refused to remove his underwear and complete the strip search. Correctional Officer Roberts[2] walked out of the cell. Mendoza issued several more orders but Forrest remained non-compliant, refusing to remove his underwear. At that point, Sergeant Christopher Young directed Correctional Officer Prine to step in with his taser. Prine entered the doorway of the cell and Mendoza stepped out. Prine, who is 6'1" tall and at the time weighed 295 pounds[3], ordered Forrest to remove his underwear and comply with the strip search.

According to CO's who were present, Forrest continued to refuse to comply and continued to be verbally combative, swearing at Prine and calling him offensive names in a loud voice. At no time, however, did he make any kind of threatening movement that would indicate he was an immediate physical threat to Prine or the other officers. He remained at the back of the cell, 6 to 10 feet away from Prine, who remained at the front of the cell.

Forrest asserts that there was a female officer outside his cell, which is why he refused to comply with the orders to remove his underwear and complete the strip search[4]. This fact is disputed.

---

[2] Roberts explained that his father is related to Forrest's mother and that he has known Forrest since childhood. He backed away from the conflict because of this personal connection, as was the custom among the officers at the jail.

[3] Although Plaintiff argues in places that Prine was younger than Forrest, there is nothing in the record that establishes either that fact generally or the specifies Prine's actual age.

[4] The strip search of a male prisoner in front of female officers, if conducted for a legitimate penological purpose, would fail to rise to the level of an Eighth Amendment violation. See Johnson v. Phelan, 69 F.3d 144, 150-51 (7th Cir.1995), cited with approval in Calhoun v.

Roberts testified that one female officer was present when Forrest was first brought in, but she was asked to leave when the strip search was ordered. Neither Mendoza nor Prine recalled there being a female officer present at any time. According to Prine, there were only two female CO's on duty on March 8, 2007. Both of these officers have submitted affidavits, asserting that one of them was assigned to a post on the second floor and one to the main control. Neither was, according to their affidavits, present at the scene of the incident involving Forrest, and neither was standing outside the door to the holding cell.

Although Forrest eventually complied with the order to remove his underwear, he continued to refuse to comply with the "more intimate maneuvers" that were part of the strip search. Several times, Prine warned Forrest to comply with the strip search or he would be tased. During these warnings, Prine testified that he aimed the red laser sighting dot from the taser on Forrest's midsection, although Forrest characterized the taser as "in his face" and "pointed at his face." Prine activated the taser, using two hands, holding the taser directly in front of him as if shooting a gun.

Prine testified that, just as the taser was activated, Forrest turned sideways and squatted. Mendoza testified that he was able to tell, from the red taser light, that Prine was aiming just above Forrest's stomach and that it was difficult to hold because Forrest was moving around. Mendoza stated that, just before the taser was deployed, Forrest moved to his left and "it was kind of almost like a duck, almost to prepare – I would say to prepare for the shock, initial fear." When asked his opinion as to whether Prine intentionally shot at Forrest's facial area, Mendoza was unequivocal; Prine did not intentionally sight on Forrest's face or shoot at his facial area. Young stated in his

---

DeTella 319 F.3d 936, 939 (7th Cir.2003). Plaintiff does not assert that the search was unconstitutional for this reason; the only reason this is raised is apparently to explain Forrest's reluctance to comply with the orders he was given.

5

affidavit that he could see the taser sight on Forrest's torso and that Forrest "ducked down and turned just as the taser was deployed." Forrest disputes this, stating that he never ducked down, but was simply pacing back and forth and that he turned to the side and raised his arms.

The two darts struck him, one in the right cheek near his right eye, and the other in his right arm. He fell into the wall of the holding cell, hitting his face. Forrest's oral surgeon diagnosed him as having a mild depressed deformity of his left zygomatic arch in his left cheek. The surgeon performed surgery to repair the fracture, but testified that this mild fracture would have healed on its own without complication and without any type of treatment.

Prine attended a 6 week police training institute in Springfield, Illinois, upon his hire. Included in that course was training in jail procedures based on standards set by the Illinois Department of Corrections. After that training, Prine participated in a Field Training Officer program at the Rock Island County Sheriff's Department ("Sheriff's Department"). In addition, Prine became certified in the use of a taser by Sgt. Mitch Lee of the Sheriff's Department in 2005. Since 2005, he has been required to recertify on an annual basis, which he has successfully done. He recertified in January of 2007, less than 2 months before the incident in this case.

The Sheriff of Rock Island County is defendant Michael Huff. The Sheriff has a written policy regarding the use of a taser by CO's at the jail. The policy equates taser and pepper spray as the same level of force, either of which is appropriate for use "to control a dangerous or violent subject when it may be unsafe for Correctional Officers to approach within hands on contact range of a subject." According to Prine's co-worker, CO Michael Mendoza, however, CO's do not use pepper spray in the confines of a holding cell for two reasons. First, there is a risk that, in the confined quarters of a cell, the spray will affect the officer as well as the prisoner. Second, once

6

pepper spray is used, a taser cannot be used because it leaves combustible materials in the air that might explode when the taser is activated. Tasers are therefore used to gain control within a cell. A taser deploys two darts simultaneously, and a five second electrical charge runs between the darts.

Plaintiff filed this complaint. He has named as defendants Michael Prine in his individual and official capacities (Count I), alleging that use of the taser under the circumstances constituted the use of excessive force in violation of his Fourth and Fourteenth Amendment rights. He has also sued Huff in his official capacity (Count II), on the grounds that CO's at the jail were inadequately trained and supervised with respect to the amount of force appropriate "to secure compliance with commands to a disabled person in their care and custody," in violation of his Fourth and Fourteenth Amendment rights. In Count III, Forrest alleges that the individual defendants were motivated by his race or ethnic origin, violating his right to Equal Protection under the Fourteenth Amendment. Count IV is a common law battery claim against Prine. He seeks compensatory damages for his facial injury.[5]   Huff and Prine have each filed a motion for summary judgment.

## EQUAL PROTECTION

Forrest concedes that the portion of his first amended complaint based on the Equal Protection clause cannot be proved. See Response, p.2 n.1. He agrees to entry of judgment against him on that claim. Prine's motion for summary judgment as to Count III is therefore granted.

## PRINE'S MOTION

---

[5] Forrest does not seek compensation for any injury resulting from contact with the taser darts.

Prine argues that he is entitled to qualified immunity as to the excessive force claim in Count II. Qualified immunity is an affirmative defense. Sparing v. Vill. of Olympia Fields, 266 F.3d 684, 688 (7th Cir. 2001). However, once the defense is raised, it becomes the plaintiff's burden to defeat it. Mannoia v. Farrow, 476 F.3d 453, 457 (7th Cir. 2007); Spiegel v. Cortese, 196 F.3d 717, 723 (7th Cir. 1999). If the plaintiff cannot establish that the defendant's conduct violated a constitutional right, and that the constitutional right was clearly established at the time he acted, then summary judgment should be entered for the defendant. Jewett v. Anders, 521 F.3d 818, 823 (7th Cir. 2008); Saucier v. Katz, 533 U.S. 194, 201 (2001).

The first prong of the qualified immunity analysis is whether a constitutional right was impacted by the defendant's conduct. Although pretrial detainees are protected by the Fourteenth Amendment and not the Eighth Amendment, the Seventh Circuit assumes that the standards of the Eighth Amendment apply to claims of excessive force made by pretrial detainees. Zentmyer v. Kendall County, 220 F.3d 805, 810 (7th Cir. 2000); Johnson v. Moeller, – F.2d –, 2008 WL 695042 (7th Cir. 2008), citing Wilson v. Williams, 83 F.3d 870, 876-77 (7th Cir. 1996). As pertinent to this case, the Eighth Amendment protects pretrial detainees from force exercised "maliciously and sadistically to cause harm," rather than for the purpose of restoring order. Hudson v. McMillian, 503 U.S. 1, 7 (1992); Fillmore v. Page, 358 F.3d 496, 503 (7th Cir. 2004). Factors pertinent to evaluating the conduct of a law enforcement officer's conduct include the need for application of force, the amount of force used, the threat reasonably perceived, efforts made to temper the severity of force used, and the extent of injury caused to the inmate. Fillmore, 358 F.3d at 504.

The Seventh Circuit has not ruled on the constitutionality of the use of tasers. Other courts have, consistently finding no Eighth Amendment violation where the taser was used for enforcement

of discipline and security and not for the sole purpose of punishment or infliction of pain. See, Jefferson v. Cruse, - F.3d -, No. 07-15573, 2009 WL 1112762, April 13, 2009 (9th Cir.)( use of taser to enforce discipline and security and not for the sole purpose of punishment or infliction of pain does not violate Eighth Amendment); Hunter v. Young, - F.3d -, No. 06-3371, 2007 WL 1678060, June 12, 2007 (10th Cir.)(use of a taser is not per se unconstitutional when used to compel obedience by inmates); Hinton v. Elwood, 997 F.2d 774 (10th Cir. 1993); Jasper v. Thalacker, 999 F.2d 353, 354 (8th Cir. 1993)(use of stun gun to subdue unruly inmate did not violate 8A where there was no evidence that officers used gun sadistically or maliciously to cause harm); Caldwell v. Moore, 968 F.2d 595, 602 (6th Cir. 1992)(use of taser on disruptive prisoner to restore discipline and order does not violate 8th Amendment); Russo v. Cincinnati, 953 F.2d 1036 (6th Cir. 1992). Draper v. Reynolds, 369 F.3d 1270 (11th Cir. 2004). Cf. Michenfelder v. Sumner, 860 F.2d 328, 336 (9th Cir.1988)(policy of allowing use of tasers on inmate who refuses to submit to a strip search does not constitute cruel and unusual punishment), cited with approval in Gibbons v. Higgins, 73 F.3d 364 (table), text at 1995 WL 761743 (7th Cir. 1995). See also, Hickey v. Reeder, 12 F.3d 754, 757 (8th Cir. 1993)(inmate's refusal to sweep his cell was not a security threat, so use of taser violated the Eighth Amendment).

The Seventh Circuit has considered other forms of force used in the prison context (as opposed to during an arrest). In Gibbons, supra, the prison guards were conducting a good faith sweep of the entire segregation unit. Gibbons refused to submit to a strip search and would not come to the front of his cell to be handcuffed. The guards used two brief blasts from a water hose; the plaintiff held up his mattress as a shield. Physical force was required to subdue and handcuff him. Plaintiff had no evidence of malice or sadism, other than the fact that he was alone in a locked cell

at the time. The Court of appeals noted that orders given to inmates must be obeyed and that the use of the water hose under those circumstances did not offend the Eighth Amendment. The fact that he was alone in his cell did not alter that conclusion.

. In <u>Burton v. Ruzicki</u>, - F.3d -, 258 Fed.Appx. 882, 885, 2007 WL 4246111, 2 (7th Cir.2007), the Seventh Circuit affirmed the grant of summary judgment for the defendants, where officers used a "blanketing technique" and then pepper spray in responding to an inmate who refused to obey orders. The Court found no evidence that the officers acted maliciously or sadistically, and noted that the use of pepper spray when reasonably necessary to subdue an inmate does not violate the Eighth Amendment, citing <u>Soto v. Dickey</u>, 744 F.2d 1260, 1270 (7th Cir.1984). In <u>Soto</u>, the Seventh Circuit held that the use of chemical agents to subdue a recalcitrant prisoner, even one who is locked in his cell or in handcuffs, does not violate the Eighth Amendment.

Forrest concedes that he is not challenging his arrest or detention, nor is he disputing that he was disobedient to the commands of the officers at the jail that he comply with the strip search. He is only challenging the need to use a taser at all, contending that there were "far less potentially injurious methods of securing compliance" and that "the need to secure compliance was small relative to the amount of force used to secure it." (Response, Doc. #69 at p.9). In other words, plaintiff is referring to several of the factors identified as pertinent, namely the need for application of force, the amount of force used, and the threat reasonably perceived.

There is no merit to Forrest's contention that there was no need to use any force at all because it was not important to obtain immediate compliance with the order. The very purpose of the strip search - to ensure that no weapons or contraband is brought into the jail - illuminates the need for

prompt compliance[6]. More importantly, however, as each of the cases cited above emphasizes, inmates and detainees do not get to decide when and how to comply with orders. Forrest was given multiple opportunities to comply with the orders he had been given, but he remained defiant. When an inmate cannot be persuaded to obey an order, "some means must be used to compel compliance," because discipline in a correctional institution is "essential if the prison is to function." Soto, 744 F.2d at 1267. The use of some amount of non-lethal force such as a taser was justified in this case.

With respect to the amount of force used, Forrest complains of Prine's selection of the taser as the specific means of enforcing his commands, arguing that other "less potentially injurious" methods were available..He appears to be referring to brute physical force, because he makes specific reference to the "human force available to Prine and the vulnerable state of Forrest." Forrest does not fully explain, however, how physical force would have been equally effective but less injurious.. This argument is flawed because it is based on a faulty assumption, namely that use of a taser is substantially more forceful and harmful than a physical, hands-on takedown. While there is no question that a taser inflicts a significant jolt, any resulting injury from the taser itself is temporary and minimal. In this case, Forrest's injury occurred in the aftermath of the taser shock. Had Prine chosen brute force instead of the taser to effect compliance, it requires no stretch of the imagination to foresee that a similar type of injury - or one much more serious - could have resulted. It was not unreasonable for Prine to have determined that utilizing a taser to subdue Forrest was less likely to

---

[6]There is un-rebutted testimony that it is mandatory for a strip search to be completed when a person is brought in on a felony charge. Plaintiff asserts that this did not mandate a search of Forrest because no charges had yet been filed, but that belies the reality of the situation. Police officers making an arrest have a very good idea of the charges that will be filed. In Forrest's case, the officers were told that he had hit a police officer, which meant that one of the charges would be aggravated battery, a felony. His assertion that the strip search was discretionary in Forrest's case is rejected.

cause physical injury to Forrest than physically restraining Forrest, bending him at the waist, and completing the strip search while he struggled.

Forrest also asserts that use of a taser was inappropriate he was in a "vulnerable state," characterizing himself as a "middle-aged, injured, naked man." This characterization is quite an overstatement. First, Forrest was not some pathetic, feeble, elderly man, nor was he dwarfed by Prine's size. He was 42 years old, older than Prine but not sufficiently older to make a significant difference in this case. Forrest was in sufficiently good physical condition to have fought with a group of police officers. He was roughly the same size and weight as Prine. If Prine had chosen to use his physical strength and relative youth to overpower Forrest, the likelihood of injury would not have been reduced.

With respect to Forrest's assertion that he was disabled, Prine had no way of knowing that. The only officer who knew that Forrest sometimes walked with a cane was Roberts, and there is no evidence that he - or anyone else including Forrest himself - so informed Prine. Moreover, Forrest himself said he walked into the jail under his own steam (Forrest dep. p. 36) and was "movin' back and forth ... like a cat" in his cell just prior to being tased (Id. at p. 46-47). His "disability" simply does not come into play as a factor in Prine's decision making process. But even if one assumes that Forrest was disabled and further that Prine knew or should have known of his injury, the impact of such knowledge weighs against Forrest. Using brute physical force on someone who already suffers from a disabling knee injury would appear a more questionable decision than the decision to deploy a taser.

Forrest next argues that Prine had no reasonable basis to fear that Forrest would become violent, but I disagree. Prine had been advised by the arresting officers and/or by his sergeant that

Forrest had already been combative and physically violent, towards his family and towards police officers. While Forrest made no direct move towards Prine, his fists were clenched; he was pacing and yelling obscenities. It was not unreasonable for Prine to have believed that the use of the taser was necessary to forestall any further physical violence, even if there was no immediate threat.

These factors - the need for application of force, the amount of force used, and the threat reasonably perceived - all weigh heavily in favor of a finding that Prine's use of force was for the purpose of enforcing his verbal commands and not for any illegal purpose. But Forrest asserts that there is other evidence suggesting that Prine's use of the taser was malicious or sadistic. This evidence consists primarily of Forrest's testimony that the taser was aimed directly at his face; hence, it was intentional, not accidental, that one of the prongs did in fact hit his face. Plaintiff's testimony is offered to contradict Prine's testimony that the taser was aimed at Forrest's torso and that Forrest made evasive movements that resulted in the dart striking somewhere other than were it had originally been aimed. On the surface, it would appear that this is a disputed fact and a material fact. A careful analysis, however, belies any such conclusion.

Forrest testified that he first saw the taser when he turned around, and that it was "in his face." That is not directly contrary to Prine's testimony; a gun-like weapon pointed anywhere at a person would appear to that person to be "in" his face. But Forrest also insists that, as he was pacing back and forth in the back of the cell 6-10 feet away from Prine, the taser remained pointed at his face. It is highly improbable that Forrest was able to accurately determine precisely that the taser was pointed at his face, not his torso. The red pointer light of the taser, if it were pointed at his face, would of course not have been visible to Forrest, and nowhere does he say that he that he did or did not see the red light on his body.  As a practical fact, I find that as Forrest paced back and forth,

13

angry and yelling at Prine, he had no ability to determine accurately where the taser was aimed, beyond saying that it was pointed at him. In other words, he had no personal knowledge of this fact and his testimony on that regard is inadmissible. With respect to whether he "ducked" or simply paced back and forth, there is no dispute that he was moving around, making an accurate shot highly difficult. I therefore decline to attribute any significance to Forrest's testimony with respect to where on his body the taser was pointed..

Secondarily, Forrest argues that, given the insulting language he had directed at Prine, assailing his manhood and sexual orientation, it would be reasonable to conclude that Prine intentionally and sadistically deployed the taser at his face in retaliation. Forrest also points out that statements from the officers about Forrest's ducking away from the taser or bending down were statements made during this litigation, not statements made contemporaneously with the underlying events. Prine's police report contains no mention of this, and the other officers either made no statement at the time or, if they did, did not mention how the taser happened to hit Forrest in the face. According to Forrest, the cumulative effect of these two assertions supports an inference of retaliation and cover up, and that is enough to defeat summary judgment.

I disagree. This Court need only draw *reasonable* inferences in favor of the Plaintiff, and neither of the two inferences Plaintiff would have the Court draw would be reasonable. First, to infer that Prine deployed the taser because of Forrest's words and not his conduct would be unreasonable because there is quite simply no evidence in the record to support such an inference; it is supported only by speculation. All of the evidence in this case points to Forrest's recalcitrant conduct as the focus of Prine's attention. Regardless of whether Forrest had reasons for refusing to comply with

14

Prine's orders, the fact remains that he refused to comply. Prine's actions followed directly in the face of such refusal.

The second inference would require the Court to attribute an improper motive to each of the officers whose testimony is proffered, finding that they may have made up their testimony for purposes of this lawsuit. This inference, too, I decline to draw. At the time Prine prepared his initial report[7], details about whether Forrest ducked, turned sideways, or bent over - or did none of these things - would not be crucial details. There would have been no reason to report such matters. The report prepared contemporaneously with the events that occurred at the jail forthrightly states that the taser prongs struck Forrest in the face and the arm, a forthrightness that would be missing if a coverup were underway. The slight variations in language chosen by the officers in their testimony and affidavits is not problematic; indeed, if identical language had been selected, this argument might carry more weight. To draw a negative inference from these reports would be to speculate.

The evidence shows that Forrest continued his disobedience to orders relating to the strip search. Prine, trained and certified in the use of a taser, fired the taser only once and only after several warnings were given to Forrest. Prine was acting as he believed the jail policy authorized him to act. It is unfortunate that Forrest was injured. But, as any number of the cases cited above point out, his injury could have been avoided if he had obeyed the commands given by the CO's. Prine's deployment of the taser did not violate the Eighth Amendment Rights of Forrest.

---

[7]On the one hand, Forrest submits that the reports are inadmissible hearsay unless accompanied by affidavits from the officers who signed them. On the other hand, he uses the language in the reports to make this argument. Because the only use to which I have put the reports is an evaluation of the language describing Forrest's movements - an issue raised by Forrest - I have disregarded his objection for purposes of this Order. This is not to be construed as a ruling that the reports are admissible in any other context.

The conclusion that Prine's conduct did not violate Forrest's Eighth Amendment rights ends the qualified immunity analysis: Prine is entitled to qualified immunity. Even if, however, I were to have concluded to the contrary - that this particular use of a taser did violate Forrest's Eighth Amendment rights - that would not help Forrest, because I also conclude that there was no clearly established law telling Prine that the use of a taser under the circumstances he faced was illegal.

A right is considered "clearly established" if the "contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right . . . In light of preexisting law the unlawfulness must be apparent." Anderson v. Creighton, 483 U.S. 635, 640 (1987). While the cases establishing the right need not be "on all fours" with the facts alleged, they must be sufficiently analogous to have made the right obvious to a reasonable official. See, e.g., Hernandez v. O'Malley, 98 F.3d 293, 297 (7th Cir. 1996); Vickery v. Jones, 100 F.3d 1334, 1340 (7th Cri. 1996). Preexisting law "must dictate, that is truly compel . . .the conclusion for every like-situated, reasonable government agent that what he is doing violates federal law *in the circumstances*." Khuans v. School Dist. 10, 123 F.3d 1010, 1020-21 (7th Cir. 1997, quoting Lassiter v. Alabama A&M University, 28 F.3d 1157 (11th Cir. 1994)[emphasis in original].

While the use of excessive force clearly violates the Eighth Amendment, the doctrine of qualified immunity demands a more fact-intensive analysis, because it protects public officials "in those situations where the law is not sufficiently clear for a reasonable official to have known that his actions were illegal." Saucier, 533 U.S. at 202;  Phelan v. Village of Lyons, 531 F.3d 484 (7th Cir. 2008). A plaintiff confronting this affirmative defense must present case law that "has both articulated the right at issue and applied it to a factual circumstance similar to the one at hand." Id.

The Plaintiff has not cited and the Court has not found one case in which an Eighth Amendment violation was found arising out of the use of a taser under the circumstances facing Prine. In fact, just the opposite is true. Prine was faced with an unrestrained inmate in close quarters who was clearly agitated and angry and was refusing to comply with orders. The orders related to a mandatory policy, the purpose of which was ensuring the safety of himself, his fellow officers, the inmate and other inmates, and the enforcement of which was part of Prine's job. The cases discussed above would lead a reasonable officer to conclude that the use of a taser under those circumstances would not offend the Constitution. It cannot be said that clearly established law prohibited the use of a taser under the circumstances facing Prine.

Because Prine is entitled to qualified immunity, his motion for summary judgment is granted.

## HUFF'S MOTION

Count II of Forrest's Second Amended Complaint alleges that the Sheriff "had in effect a policy inadequate for the training and supervision of its correctional officers with respect to the appropriate amount of force, if any, necessary to secure compliance with commands to a disabled person in their care and custody." The Sheriff has moved for summary judgment, arguing that, even assuming that Prine's conduct was improper, there is no evidence of any other incident similar to this one, and an isolated incident is not enough to support a failure to train case.

Plaintiff's response is puzzling. After conceding that Prine and the other officers were "reasonably trained in the skills necessary to become correctional officers, including the proper methods for deploying a taser," Forrest attacks as unconstitutional the strip search policy, a wholly different policy than what has been plead. Forrest summarizes his position as:

> presenting a narrow challenge to Sheriff Huff's bodily cavity search policy, although a broader challenge is certainly within the realm of possibility. Forrest's position is that to the

> extent it is even conceivably [constitutional] for the Sheriff to maintain a policy of bodily cavity searches without any regard to reasonable suspicion of the presence of contraband or a weapon, that shaky standard becomes particularly unconstitutional as applied to a detainee who is subject to the significant force of a taser if he chooses not to comply."

Response at p.4.

Plaintiff's response makes not even the slightest effort to defend the allegations in Count II. Perfunctory and undeveloped arguments are waived. See Finance Investment Co. v. Geberit AG, 165 F.3d 526 (7th Cir. Dec. 23, 1998); Indurante v. Local 705, International Brotherhood of Teamsters, 160 F.3d 364, 366 (7th Cir. 1998); Kauthar SDN BHD v. Sternberg, 149 F.3d 659, 668 (7th Cir. 1998), cert. den., 119 S.Ct. 890 (1999). A party cannot leave it to this Court to search for factual or legal support for a claim. See, e.g., Freeman United Coal Mining Co. v. Office of Workers' Compensation Programs, Benefits Review Board, 957 F.2d 302, 305 (7th Cir.1992) ("[W]e have no obligation to consider an issue that is merely raised, but not developed, in a party's brief."); United States v. Haddon, 927 F.2d 942, 956 (7th Cir.1991) ("A skeletal 'argument', really nothing more than an assertion, does not preserve a claim."). The claim set forth in Count II is waived, and summary judgment on that count is entered in favor of defendant.

Moreover, while there is no doubt that strip searches are unpleasant, humiliating, and embarrassing, not every psychological discomfort a detainee endures amounts to a constitutional violation, and strip searches are not *per se* unconstitutional. Fillmore v. Page, 358 F.3d 496, 505 (7th Cir.2004); Peckham v. Wis. Dep't of Corr., 141 F.3d 694, 697 (7th Cir.1998). They do violate the Eighth Amendment if they are "conducted in a harassing manner intended to humiliate and inflict psychological pain." Calhoun v. DeTella, 319 F.3d 936, 939 (7th Cir.2003); see also Peckham, 141 F.3d at 697; Meriwether v. Faulkner, 821 F.2d 408, 418 (7th Cir.1987). But a policy that is limited in its application to detainees brought in on felony and drug charges is a policy based on legitimate

penological concerns, and there is no evidence that it was mis-applied in Forrest's case. On these facts, based on this incident, there was no constitutional concern with the strip search of Forrest.

Plaintiff's effort to switch focus from the policy that was plead to the strip search policy is without merit. Moreover, while a plaintiff need not plead legal theories, where a theory is plead - as it was here - there are procedurally appropriate ways to advise opposing counsel and the Court that the theory is being abandoned. Doing so in a response to a summary judgment motion is not one of those appropriate ways. Huff's' motion for summary judgment is granted in its entirety.

## CONCLUSION

Prine's motion for summary judgment is granted in its entirety, and his motion for oral argument is denied. Huff's motion for summary judgment is granted in its entirety.

This case remains set for a final pretrial conference on November 18, 2009 at 2:30 p.m. in person in Rock Island as to the state law battery claim, and the trial on that claim remains scheduled for January 11, 2010.

ENTERED ON  September 4, 2009

*s/ John A. Gorman*

JOHN A. GORMAN
UNITED STATES MAGISTRATE JUDGE